**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
                                                     :

**FIRST METLIFE INVESTORS**                                        :
**INSURANCE COMPANY**                                             :
                                                     :
                             **Plaintiff**    :       **08 CV 10113 (HB)**
             - against -               :       **OPINION & ORDER**
                                                     :

**MARIAN ZILKHA and KAREN PATOU**                       :
**as EXECUTRIX of the ESTATE OF**                         :
**STEPHEN BOSNIAK,**                                            :
                                                     :
                          **Defendants.**       :
                                                     :
-------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      First Metlife Investors Insurance Company ("Metlife") commenced this interpleader action in connection with the proceeds of a $2 million life insurance policy taken out on the life of Dr. Stephen Bosniak ("Bosniak"), who died intestate in February 2007, just a few months after the policy was issued.  Having determined that the claim was payable, the company deposited the proceeds with the Court and Metlife has been dismissed from this action.  *See* Order, dated February 17, 2009 (Docket No. 12).  The instant dispute arises between Marian Zilkha ("Zilkha"), the owner and designated beneficiary of the policy and, at a minimum, a business associate of Bosniak, and Karen Patou ("Patou"), Bosniak's sister and administratrix of his estate.[1]  Zilkha and Patou cross move for summary judgment on Patou's first cross-claim seeking disgorgement and recovery of the proceeds of the Metlife policy.  Because Zilkha adduces competent evidence that she had an "insurable interest" in Bosniak's life pursuant to N.Y. Ins. Law § 3205(a)(1) that Patou fails to rebut, and for the reasons further set forth below, Zilkha's motion for summary judgment is GRANTED, and Patou's motion for summary judgment is DENIED.[2]

---

[1] The caption incorrectly identifies Patou as executrix of the Bosniak estate.

[2] As discussed in Section III.C., *infra*, neither party made a dispositive motion on Patou's second or third cross-claims.  Because the date for dispositive motions has passed, Patou's second and third cross-claims will proceed to trial as scheduled.

## I. FACTUAL BACKGROUND

The central and dispositive issue in this litigation is whether Zilkha had an "insurable interest" in the life of Bosniak in October 2006 when the life insurance policy was issued. As discussed below, under applicable New York law, an "insurable interest" includes "a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the insured." N.Y. Ins. Law §3502(a)(1). Zilkha contends that she had an "insurable interest" in Bosniak's continued life because she and Bosniak were partners in a joint business venture to develop cosmetic products and develop new medical techniques. Patou maintains, on the other hand, that "in an effort to satisfy the 'insurable interest' requirement of the New York Insurance Law, Zilkha knowingly, intentionally and unlawfully represented [on the insurance application] that she was a partner in Dr. Bosniak's medical practice." Patou's Mem. In Supp. of Mot. at 5.

Zilkha is an ophthalmic surgeon who was educated and is licensed to practice medicine in Brazil.[3] Aff. of Marian Zilkha, dated June 27, 2009 ("Zilkha Aff.') ¶ 6. Bosniak, too, was an ophthalmic surgeon, although he was licensed to practice in New York. Bosniak and Zilkha first met at a medical conference in 1993. *Id*. The two apparently hit it off and would visit each other's offices in Brazil and New York respectively to observe and learn from each others' surgical techniques. *Id.* ¶7. According to Zilkha's affidavit, the two doctors decided to pursue their joint business interests as a partnership to create cosmetic beauty products and to develop

---

[3] Brazil has more plastic surgeons per capita than any other country in the world, and American plastic surgeons often adopt surgical innovations developed in Brazil once they are approved in the U.S. Spodek Aff. Ex. HH, Emily Dougherty, *Smooth Operators*, HARPER'S BAZAR, July 1, 2001, at 64. In 1998, the New York Times referred to Brazil as the "world capital of plastic surgery, with 200,000 operations performed a year, half of them in Rio [de Janeiro]." Diana Jean Schemo, *The Beauty of It! Face Lifts Pay for Poor's Surgery*, N.Y. TIMES, February 25, 1998, at A4. According to Zilkha's affidavit, "[t]he practice of cosmetic surgery is very much an international medical practice and Rio de Janeiro, Brazil is considered by many to be the world center for such services." Zilkha Aff. ¶ 5. Anne Akers, a "practice enhancement" consultant for doctors, states that Bosniak and Zilkha "were aware of the advent of medical tourism[,] the practice of patients traveling from North America and Europe, especially Brazil for medical treatments and in particular for plastic surgery procedures." Affidavit of Anne Akers, dated June 9, 2009 ("Akers Aff.") ¶7; *see also*, Adriana Brasilieiro, *Brazilian Breast Implant Bargains Entice Americans, Europeans*, Bloomberg.com, May 29, 2007 (reporting that face lift procedure can cost as little as $1,900 in Brazil, as compared to $6,000 in the United States, and that in 2006 50,000 foreigners traveled to Brazil for health treatments).

new surgical techniques and nonsurgical rejuvenation techniques. Zilkha Aff. ¶ 19-24. The partnership operated informally under the name Bosniak + Zilkha.[4] *Id*. ¶27-29.

In support of her instant motion Zilkha proffers extensive documentary and testimonial evidence that supports the existence of a business enterprise between the two doctors. For example, in an article in a periodical, Dermatology Times, that discusses the "BZ Lift," an eye-lift procedure developed by Bosniak and Zilkha, Bosniak states that the procedure was named after him and "his business partner Marian Cantisano-Zilkha." Spodek Aff. Ex. F. Zilkha also submits affidavits from a medical-business consultant (Anne Akers), an accountant (Barry Berg), and an insurance broker (Jay Hochfelsen) each of which corroborates the existence of a business enterprise between Bosniak and Zilkha that predated October 2006 issuance of insurance policy. Spodek Aff. Exs. B, C, D. The two doctors also jointly retained a lawyer (Wendy Miller) to advise Bosniak + Zilkha on intellectual property matters. Spodek Aff. Ex. I. The business activities of Bosniak + Zilkha are also well documented. For example, in addition to jointly developing the new surgical procedure the "BZ Lift," the two doctors developed a machine to administer carbon dioxide gas to rejuvenate the appearance of skin and eyelids that they called the CO2 Cellulair, conducted a medical study of 2,241 patients in Brazil pertaining to the use of a drug named Restylane, created and produced a line of cosmetic products under the name "Beautif-eye" with packaging that bore the name of the partnership, and contracted to establish beauty spas in Equinox Gyms in New York City under the Bosniak + Zilkha mark. Zilkha Aff. ¶ 14, 24; Akers Aff. ¶10; Spodek Aff. Exs. H, J, GG. In December 2006, Bosniak and Zilkha published, as co-authors and joint copyright owners, a book titled *Beautifeye*, to promote their business enterprise and its products. Akers Aff. ¶14-15; Spodek Aff. Ex. M. In early 2007, shortly before Bosniak's death, the two doctors had scheduled meetings with Oprah, Glamour, and Allure magazines to promote the book. Akers Aff. ¶ 17.

The reciprocal life insurance policies issued in October 2006 were not the first "keyman" insurance policies Bosniak and Zilkha took out on one another. In 1999 the two doctors took out

---

[4] Bosniak and Zilkha jointly applied for co-equal trademark rights to the Bosniak + Zilkha mark as well as the marks "Beautifeye" and "Beautif-Eye" in April and May 2005. *See* Spodek Aff. Ex. I. Through their jointly retained counsel, in June 2006 the two doctors executed an assignment to transfer those rights to a limited liability company named Bosniak + Zilkha Beauty LLC. *Id.* It is not clear, however, that the company was ever duly formed. Berg Aff. ¶10.

$750,000 reciprocal term life insurance policies.[5]  Spodek Aff. Ex. K.  In a sworn affidavit, the accountant to the partnership, Barry Berg, states that he became concerned that the $750,000 life insurance policy was "inadequate given the large-scale plans they had for the partnership."  Affidavit of Barry Berg, dated June 25, 2009, ("Berg Aff.") ¶11.  Berg recommended that the two doctors consult Jay Hochfelsen, the insurance broker, to discuss an increase in the amount of their coverage.  *Id.*  Hochfelsen met with Bosniak and Zilkha on several occasions in 2006 and personally assisted them in completing the life insurance applications.  Affidavit of Jay J. Hochfelsen, dated June 10, 2009 ("Hochfelsen Aff."), ¶ 9.  Hochfelsen states that he was aware that Zilkha was not licensed to practice medicine in New York and that accordingly she could not have an equity interest in Bosniak's medical P.C. *Id.* at ¶10.  The insurance application for the policy on Bosniak's life specifies, under the section titled "owner," that Zilkha's relation to the proposed insured Bosniak is "partner in practice."  Decl. of Alan C. Glassman, dated May 14, 2009 ("Glassman Decl.") Ex. H.  On the signature line, following Zilkha's signature, appears the notation "Business Partner." *Id.*

As noted, Patou's central theory is that Zilkha "knowingly, intentionally and unlawfully represented [on the insurance application] that she was a partner in Dr. Bosniak's medical practice."  Patou's Mem. In Supp. of Mot. at 5.  Although she asserts several evidentiary objections to the evidence that corroborates the existence of the Bosniak + Zilkha partnership— *e.g.* violation of the so-called Dead Man's Statute, attorney-client privilege, and the parol evidence rule—Patou does not adduce evidence to counter the substantial evidence of *some* Bosniak + Zilkha enterprise.[6]  Rather, Patou contends that "Bosniak + Zilkha[] is an illegal entity

---

[5] In 1999 policy of which Zilkha was a beneficiary, Bosniak was listed as her "business partner." Spodek Aff. Ex. K.

[6] In the Court's view, the existence of a business enterprise is amply established by evidence to which Patou does *not* assert evidentiary objections.  Consequently, because they are not material to disposition of the instant motions, the Court declines to rule on each and every one of Patou's evidentiary objections.  Nevertheless, it is worth noting that Patou's objections are largely without merit.  For example, Patou argues that the business consultant Akers, insurance broker Hochfelson, and accountant Berg are incompetent to testify about statements made to them by Bosniak under the dead man's statute due to their "interest in the event" at issue.  But the proffered interests in the outcome of this litigation are far too attenuated to warrant application of the dead man's statute.  Patou argues that Hochfelsen and Berg may "lose" by virtue of a future claim on an invoice or for malpractice.  *Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996) (citing *Duncan v. Clarke,* 125 N.E.2d 569, 570 (N.Y. 1955) ("[T]he 'interest' which renders a witness incompetent under [the statute] is only such as results from the 'direct legal operation of the judgment.'")  Similarly, Patou's attempt to assert the attorney-client privilege to bar

4

by virtue of the fact that no such entity can exist under New York law, since neither Bosniak nor Zilkha were duly licensed to practice medicine outside of their hometowns." Patou's Mem. in Opp'n. at 6.  To support her argument that Zilkha's only interest in Bosniak's life was an "illegal" interest in Bosniak's New York medical practice, Patou points to the notation in the insurance application stating that Zilkha is a "partner in practice" to Bosniak, and tax records that show during the years 2004 and 2005 Zilkha received payments designated as compensation from Bosniak's medical professional corporation (the "P.C.").  *See* Glassman Decl. Ex. L.  Patou also contends that certain documentary evidence suggests that Zilkha held herself out as a partner in Bosniak's medical practice.  For example, a Patou points to an advertisement for Bosniak + Zilkha produced by a public relations firm that describes Bosniak and Zilkha as "well respected New York Eyelid surgeons."[7]  Decl. of Alan C. Glassman, dated August 7, 2009 ("Supp. Glassman Decl."), Ex. C.  Patou also points to statements in the affidavits of Zilkha, Hochfelsen, and Akers that reference the two doctors' "international medical practice."  Patou argues, in effect, that because there is "no such thing" as an "international medical practice," Zilkha must have been illegally practicing medicine in New York through the P.C.

Patou further contends that Zilkha has failed to establish the prerequisites of a "*de facto* partnership," because she adduces no evidence that the partnership maintained separate books and records and Zilkha allegedly disclaimed liability to a purported creditor of the partnership; in an email to a supplier who claimed to have worked on a Bosniak + Zilkha eye-cream, Zilkha's counsel stated that Zilkha "does not have personal responsibility or the debts of the late Dr. Bosniak or his professional corporation" and directs the alleged creditor to counsel for the estate. *See* Supp. Glassman Decl. Ex. G.  Finally, Patou contends that even if Zilkha has adduced evidence of a lawful partnership, she has failed to show that the business ever earned any money.

---

admission of communication between the intellectual property lawyer Wendy Miller and Bosniak misses the mark because other competent and undisputed evidence establishes that Bosniak and Zilkha retained Miller's services jointly. See Zilkha Aff. ¶¶ 16-18; Zilkha 56.1 Stmt. ¶25 (admitted by Patou).  The attorney-client privilege does not shield attorney-client communications from disclosure in the context of litigation between the two joint clients.  *See, e.g.*, *MacKenzie-Childs LLC v. MacKenzie-Childs*, 2009 WL 2487125, *7 (W.D.N.Y. Aug. 14,2009).  Furthermore, "[t]he burden of establishing the attorney-client privilege, in all its elements, always rests upon the person asserting it." *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989).  Patou fails to satisfy this burden here.

[7] Zilkha, for her part, offers as evidence a different version of the same press release that specifically refers to her as a "Rio de Janeiro eyelid surgeon" and Bosniak and Zilkha collectively as "well respected international eyelid surgeons."  Spodek Aff. Ex. T.

## II. LEGAL STANDARD, JURSDICTION AND APPLICABLE LAW

### A. Summary Judgment Standard

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* 247-48.  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (internal citation omitted). Rather, he "must come forward with evidence sufficient to allow a reasonable jury to find in [his] favor." *Brown*, 257 F.3d at 252; *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added).

Where, as here, both parties move for summary judgment the court is not required to grant judgment as a matter of law for either.  *Morales v. Quintel Entm't., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

### B. Jurisdiction and Applicable Law

This action was originally filed under 28 U.S.C. § 1335, which grants district courts original jurisdiction over suits in interpleader where diversity of citizenship exists between two adverse claimants to the same property, and the amount in controversy exceeds $500. *See* Complaint at ¶ 4. In such diversity suits, federal courts are bound to apply state law. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78-79 (1938); *see, e.g., Sun Life Assur. Co. of Canada (U.S.) v. Gruber*, No. 05 Civ. 10194(NRB), 2007 WL 4457771, *5 (S.D.N.Y. Dec. 17, 2007) (applying New York law to a suit brought under 28 U.S.C. § 1335); *Continental Coffee Products*

*Co. v. Banque Lavoro S.A.,* 852 F.Supp. 1235 (S.D.N.Y.1994) (same).  The parties do not dispute that the substantive law of New York law applies to their dispute over entitlement to the life insurance proceeds.

### III. DISCUSSION

The law does not allow so-called "wager" insurance policies, *i.e.* insurance that is tantamount "to a mere wager, by which the party taking the policy is directly interested in the early death of the assured." *Warnock v. Davis*, 104 U.S. 775, 779 (1881); *Herman v. Provident Mut. Life Ins. Co. of Philadelphia*, 886 F.2d 529, 534 (2d Cir. 1989) ("[W]hen the beneficiary's interest is in the insured's death rather than in his life, public policy is contravened."); *Grigsby v. Russell*, 222 U.S. 149 (1911) (Holmes, J) ("A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end.")  In New York, this prohibition is codified at N.Y. Ins. Law §3205, which provides that no person may contract for a policy of insurance on the "person of another" unless the benefits of the policy are payable to "the person insured, or his personal representative or to a person having, at the time when such contract is made, an insurable interest in the person insured."  N.Y. Ins. Law §3205(b)(2).  The statute defines an "insurable interest" as

> (A) in the case of persons closely related by blood or by law, a substantial interest engendered by love and affection; [or] (B) in the case of other persons, a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the insured.

N.Y. Ins. Law §3205(a)(1).

### A. Patou has Standing to Assert her Claim

As a preliminary matter, as administratrix of Bosniak's estate, Patou has standing to assert her claim, notwithstanding the general majority rule that the lack of an insurable interest may only be raised by the insurer.  *See* LIFE INSURANCE: RIGHT TO RAISE QUESTION OF LACK OF INSURABLE INTEREST, 175 A.L.R. 1276 (1948) (describing general rule that defense of lack of insurable interest is available only to the insurer and citing cases).  As Judge Castel recently noted, New York Insurance Law § 3205(b)(4), permits, "in the case of a dispute over insurable interest under a life insurance policy," "an 'executor or administrator' to bring action 'to recover such benefits from the person receiving them.'" *2004 Stuart Moldaw Trust v. XE L.I.F.E., LLC*, No. 08 Civ. 9421(PKC), 2009 WL 2222935, *8 (Jul. 27, 2009) (finding conflict between New York law and California law which provides that questions of insurable interest are properly

raised only by the insurer).[8]   Consequently, Patou has standing to raise the issue of a lack of an insurable interest.

### B.  Zilkha had an Insurable Interest in Bosniak's Life

The dispositive question here is whether Zilkha had an insurable interest in Bosniak's life in October 2006, the date of the *inception* of the policy. *Herman*, 886 F.2d at 534.  Whether an insurance contract is valid at its inception or void as a wagering policy depends . . .  on the intention of the parties at the time it is procured; that intention is a question of fact." *Id.* (citing *Steinback v. Diepenbrock,* 158 N.Y. 24, 30 (1899)).  Notwithstanding that the relevant question is the same as the central inquiry in contract interpretation, to resolve the question here the Court is not constrained to four corners of the insurance contract.  *See*, *e.g.*, *Berger v. Manhattan Life Ins. Co.*, 805 F.Supp. 1097, 1105 (S.D.N.Y. 1992) (examining evidence of business enterprise to determine existence of insurable interest); *Cosentino v. William Penn Life Ins. Co. of New York*, 224 A.D.2d 777, 777 (3d Dep't 1996) ("uncontroverted documentary evidence" established defendant's "status as a creditor of decedent and, thus, the existence of a legally recognized insurable interest.")  Consequently, even if the reference in the insurance application to "partner in practice" were *un*ambiguous—which it is not, the term itself is susceptible to more than one meaning and the application elsewhere specifies the doctors were "business partners"—the inquiry would not end there.

Here, the evidence adduced by Zilkha amply establishes the existence of a Bosniak + Zilkha enterprise and thus an insurable interest. *See*, *e.g.*, *Berger v. Manhattan Life Ins. Co.*, 805 F.Supp. 1097, 1105 (S.D.N.Y. 1992) (finding evidence of a business certificate, testimony of a friend to two alleged partners that they had a "long-standing business relationship," and testimony of insurance broker that alleged partners represented themselves as a partnership sufficient to create triable issue of fact as to existence of "insurable interest"); *see also Herman*, 886 F.2d at 534 (partnership had insurable interest in life of key partner); *Connecticut Mutual*

---

[8] Zilkha cites to *Moran v. Moran,* in which the court stated that the "[p]laintiff has no standing to object, since only the insurer can raise the objection of want of an insurable interest." 74 Misc. 2d 384 (Dist. Ct. Suffolk Co. 1973) (citing *Wagner v. Gaudig & Blum Corp.*, 223 App. Div. 254, 259 (1st Dep't. 1928)).  However, both *Moran* and *Wagner* are inapposite.  First, *Moran* did not concern a life insurance policy and the issue of lack of an insurable interest was not raised by the "executor or administrator" of the estate of the insured.  Second, in *Wagner* the issue of an insurable interest was raised by the defendant beneficiary of the life insurance policy, who had been previously paid the proceeds thereof and who attempted to use the alleged illegality of the contract to avoid paying the insured's surviving wife a percentage of the proceeds.

*Life Insurance Company v. Luchs*, 108 U.S. 1498, 505 (1883) (continuance of partnership and of partner's life "furnished a reasonable expectation of advantage" to co-partner).   The well-documented undertakings of the Bosniak + Zilkha enterprise discussed above include the joint development of new surgical techniques, a carbon dioxide skin "rejuvenation machine," and a line of cosmetic products marketed under the Bosniak + Zilkha mark.  Furthermore, the two doctors jointly owned the intellectual property associated with the enterprise including trademarks, the copyright to the book and, allegedly, a patent in the CO2 Cellular device.  Such evidence amply establishes that Zilkha had a "substantial economic interest in the continued life" of Bosniak. N.Y. Ins. Law §3205(a).

Accordingly, to defeat summary judgment, Patou must come forward with evidence that would be sufficient to support a jury verdict in her favor, *i.e.* that Zilkha did *not* have a lawful and substantial economic interest in Bosniak's continued life.  *Brown*, 257 F.3d at 252.  Patou attempts cast doubt principally upon the *lawfulness* of the Bosniak + Zilkha enterprise and secondarily on the economic value of the venture.[9]  In both respects, Patou fails to adduce evidence sufficient to create a genuine issue of material fact.  In sum and substance, Patou's argument with respect to the alleged unlawfulness of the Bosniak + Zilkha enterprise is as follows:  Patou maintains that Zilkha fails to establish the existence of a *de facto* partnership and that consequently the doctors' business must have either (1) operated through Bosniak's P.C. and thus violated N.Y. Partnership Law §2, which, among other things, requires that all partners in a professional partnership that provides medical services be licensed physicians; or (2) constituted an "international medical practice" that was itself illegal.

Separate and apart from the deficiencies in Patou's evidentiary showing in support of it, addressed *infra*, Patou's argument suffers from several faulty assumptions.  First, to the extent Patou assumes that Zilkha must show the existence of a *de facto* partnership to establish an insurable interest, she is mistaken.[10]  *See*, *e.g.*, *Theatre Guild Productions, Inc. v. Insurance*

---

[9] Patou argues that Zilkha fails to show a "substantial economic interest" because she does not adduce any evidence that Bosniak + Zilkha ever turned a profit.  This argument misses the mark because the relevant inquiry is whether the beneficiary has an economic interest in the "*continued* life" of the insured and the competent and uncontroverted evidence establishes that, at the time the policy was issued, Bosniak + Zilkha was in the nascent stages of a substantial expansion of their venture.

[10] Patou points to the absence of a written partnership agreement, the alleged co-mingling of funds, and Zilkha's attempt to disclaim an alleged liability of the partnership as indicia of a *de*

*Corp. of Ireland*, 267 N.Y.S.2d 297, 299 (1966) (insurable interest derived from employment of star in musical); *Hota v. Camaj*, 750 N.Y.S.2d 119, 119 (2002) (defendant was the decedent's creditor, which gave him an insurable interest in the decedent's life). Second, Patou appears to assume that if two doctors become joint venturers, it can *only* be to provide medical services in the jurisdiction in which they are licensed. *See* Patou's Mem. in Opp'n ¶27 ("[T]he fatal flaw in Zilkha's argument is that . . . Bosniak + Zilkha is an illegal entity by virtue of the fact that no such entity can exist under New York law since neither Bosniak, nor Zilkha were duly licensed to practice medicine outside their hometowns.") But N.Y. Partnership Law §2 only prohibited Zilkha from becoming a partner in Bosniak's P.C., a fact that Zilkha readily acknowledges. It is far fetched to contend that New York law prohibits licensed physicians from engaging in an otherwise lawful venture to do something other than practice medicine. Furthermore, Patou points to no authority, and the Court finds none, that outlaws the kind of "international medical practice" outlined in the affidavits and other evidence and which appears uniquely suited to cosmetic surgery connected with Brazil. *See* n. 2, *supra*.

This leaves the evidentiary showing by which Zilkha attempts to establish a genuine issue as to the lawfulness of Zilkha's claimed "insured interest," *i.e.* the Bosniak + Zilkha enterprise documented in Zilkha's submissions to the Court.[11] Patou adduces absolutely no evidence that Zilkha in fact practiced medicine without a license in New York. Instead she relies on evidence that shows that Bosniak sought legal advice about how to *avoid* the penalties attendant to practicing without a license, that in 2004 and 2005 Zilkha collected wages from Bosniak's P.C., and that a single press release (that may well have been a preliminary draft) described Zilkha as a

*facto* partnership that are lacking here. Of course "[n]o one characteristic of a business relationship is determinative in finding the existence of a partnership in fact," *Brodsky v. Stadlen*, 138 A..D. 2d 662, 663 (2d Dep't 1988) (citing N.Y. Partnership Law §11), and the co-ownership of partnership assets (*e.g.* intellectual property rights), the joint operation and control of the enterprise and the intention of the parties are indicia in *favor* of the existence of a partnership. If the existence of a *de facto* partnership were a dispositive issue here, Patou's evidentiary showing might create a genuine issue of material fact. However, it is not and therefore it does not. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")

[11] I am highly dubious that, had Metlife any plausible reason to believe that Zilkha "knowingly, intentionally, and unlawfully" misrepresented the nature of her insured interest in Bosniak's life, the insurance company would have paid a $2 million claim on a policy for which they had collected less than $10,000 in premiums without first testing Zilkha's veracity in the courts. However, because this consideration does not affect disposition of the instant motion, I merely note it as an aside.

"New York Eyelid surgeon." To conclude on the basis of such evidence that the illegality of the Bosniak + Zilkha enterprise was so pervasive as to render the entirety of Zilkha's pecuniary interest in Bosniak's continued health "unlawful" would be nothing more than conjecture.[12] That is not enough. *See Major League Baseball*, 542 F.3d at 310 (party cannot defeat summary judgment by making assertions based on speculation).

### C.  Patou's Second and Third Cross-Claims for Relief

In addition to her claim to the proceeds of the MetLife insurance policy discussed above, in her Answer with Cross-Claims Patou separately asserts (i) a second and substantially identical claim for disgorgement and recovery of the proceeds of "other insurance policies" procured by Zilkha on the life of Bosniak (the "Second Cross-Claim"),[13] and (ii) a third cross-claim, which seeks to permanently enjoin Zilkha from spending the proceeds from such "other insurance policies (the "Third Cross-Claim"). Neither party moved for summary judgment with respect to Patou's Second or Third Cross-Claims. In a footnote in her opening brief and without citation to authority, Zilkha maintains that the Court lacks jurisdiction over the Second Cross-Claim and that the Third Cross-Claim is moot. Zilkha's jurisdictional claim is presumably made with reference to her third affirmative defense, which asserts that the cross claims are not within the scope of Rule 13(g), which permits cross-claims to the extent that they arise out of the same "transaction or occurrence that is the subject matter of the original action or a counterclaim." Although I have my doubts about the merits of Zilkha's argument, *see Jefferson Standard Ins. Co. v. Craven*, 365 F.Supp. 861, 866 (D.C. Pa. 1973), I decline to raise and decide the issue *sua sponte*. Moreover, because the Third Cross-Claim seeks to enjoin Zilkha from spending the proceeds of the "other insurance policies" that are the subject of the Second Cross-Claim, it is not rendered moot by this decision on Patou's First Cross-Claim. Finally, although the *legal* issue presented by the Second Cross-Claim is identical to that decided here, the factual basis for

---

[12] In addition to the general public policy against "wager" insurance policies, New York has a clear public policy interest in deterring the unlicensed practice of medicine. This decision is in no way intended to condone any conduct by Bosniak + Zilkha that may have constituted the unlicensed practice of medicine or even pushed the boundaries of what is permitted. Rather, I merely conclude that the competent evidence before me is insufficient to establish a genuine issue of fact as to whether Zilkha's insurable interest in Bosniak's life was "unlawful."

[13] Patous's Second Cross-Claim repeats *verbatim* the allegations of the cross-claim for the proceeds of the Metlife insurance policy, substituting only the phrase "other life insurance policies" for references to the "MetLife Policy." *Compare* Answer with Cross-Claims ¶¶ 64-78 *with* 79-93.

the claim is not the same.  The existence of an "insurable interest" must be judged at the *inception* of the policy, *Herman*, 886 F.2d at 534, and the parties have not adduced evidence as to when the alleged "other insurance policies" were issued or what the business relationship between Bosniak and Zilkha looked like at the time.  Consequently, I would have no occasion to grant summary judgment *sua sponte* on the Second and Third Cross-Claims, were I inclined to do so.  Because the date for dispositive motions set by the Pretrial Scheduling Order has passed, this matter will proceed to trial on the Second and Third Cross-Claims in November as scheduled.

## IV. CONCLUSION

For the foregoing reasons, Patou's motion for summary judgment is DENIED and Zilkha's motion for summary judgment is GRANTED.  The Clerk of the Court is instructed to close these cross motions (Docket Nos. 17 and 30) and remove them from my docket. A trial date in November 2009 will be set by separate order.

**SO ORDERED**
**September 21, 2009**
**New York, New York**

U.S.D.J.